IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

DANNIE FERRELL MANN, JR.,          )
                                   )
              Plaintiff,           )
                                   )
v.                                 )          CIVIL ACTION NO. 5:07-00201
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
              Defendant.           )

## M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's application for Supplemental Security Income (SSI), under Title XVI of the Social

Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently pending before the Court on the

Plaintiff's Motion to Remand (Doc. No. 12.) and the parties' cross-Motions for Judgment on the

Pleadings. (Doc. Nos. 14 and 19.) Both parties have consented in writing to a decision by the United

States Magistrate Judge. (Doc. Nos. 6 and 7.)

The Plaintiff, Dannie Ferrell Mann, Jr. (hereinafter referred to as "Claimant"), filed an

application for SSI on March 16, 2004 (protective filing date), alleging disability as of September 12,

2001, due to back pain, headaches due to fluid on his head, chest/heart pain, trouble sleeping, crying

spells, depression, anxiety, borderline intellectual functioning, and hallucinations.[1] (Tr. at 37, 93, 94-

96, 130.) The claim was denied initially and upon reconsideration. (Tr. at 37-39, 43-45.) On October

18, 2004, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 46.) The

hearing was held on May 11, 2005, before the Honorable Valerie A. Bawolek. (Tr. at 443-72.) By

_____

[1] In his request for reconsideration, Claimant further alleged disability due to depression,
anxiety, borderline intellectual functioning, and hallucinations. (Tr. at 43, 151.)

decision dated December 30, 2005, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 12, 475.) Claimant requested review with the Appeals Council, and by Notice dated April 17, 2005, the Appeals Council remanded the case to the ALJ for further consideration.[2] (Tr. at 12, 475.)

On remand, the ALJ conducted a further administrative hearing on August 7, 2006. (Tr. at 473-97.) By decision dated September 29, 2006, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 12-21.) The ALJ's decision became the final decision of the Commissioner on January 26, 2007, when the Appeals Council denied Claimant's request for review. (Tr. at 4-7.) On March 29, 2007, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Doc. No. 1.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2004). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to

_____

[2] Claimant filed a new SSI application on February 28, 2006, which was denied by the Commissioner at the initial determination level on May 12, 2006. (Tr. at 12; Doc. No. 15 at 2.) The second claim was "escalated to the hearing level" by the ALJ. (Tr. at 12.)

Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental

disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating

and degree and functional limitation to the criteria of the appropriate listed mental disorder to

determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§

404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental

impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the

Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The

Regulation further specifies how the findings and conclusion reached in applying the technique must

be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written
> decision issued by the administrative law judge and the Appeals Council must
> incorporate the pertinent findings and conclusions based on the technique. The
> decision must show the significant history, including examination and laboratory
> findings, and the functional limitations that were considered in reaching a conclusion
> about the severity of the mental impairment(s). The decision must include a specific
> finding as to the degree of limitation in each of the functional areas described in
> paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because

he had not engaged in substantial gainful activity since the alleged onset date. (Tr. at 14.) Under the

second inquiry, the ALJ found that Claimant suffered from degenerative disc disease, borderline

intellectual functioning, and bipolar disorder, which were severe impairments. (Tr. at 14.) At the third

inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity

of any listing in Appendix 1. (Tr. at 16-17.) The ALJ then found that Claimant had a residual

functional capacity for work at the light level of exertion, as follows:

> [H]e can only occasionally climb, balance, stoop, crouch, kneel, and crawl. He reads
> on the fourth-grade level and performs arithmetic on the fifth-grade level. He is

_____

continued need for such an arrangement.

limited to simple job instructions and has a poor ability to function independently.

(Tr. at 17.) At step four, the ALJ found that Claimant could not return to his past relevant work. (Tr. at 19.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a hand packer, laundry worker, and kitchen worker, at the light level of exertion. (Tr. at 20.) On this basis, benefits were denied. (Tr. at 20-21.)

## Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

## Claimant's Background

Claimant was born on January 18, 1982, and was 24 years old at the time of the second administrative hearing. (Tr. at 20, 94, 476.) Claimant had a tenth grade, or limited, education. (Tr.

at 20, 136, 477.) In the past, he worked as a laborer. (Tr. at 131, 166-69, 172, 492.)

 The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ (1) erred in not finding that his psychological and physical impairments met or medically equaled a Listing, (2) failed to identify and discuss all of Claimant's severe impairments and include these additional impairments in his hypothetical question to the VE, (3) erred by failing to utilize a non-psychological medical expert to provide testimony regarding Claimant's combination of impairments, (4) erred in rejecting Claimant's credible testimony of back pain and limitations, (5) posited incomplete hypothetical questions to the VE, and (6) failed properly to develop the record regarding Claimant's impairments. (Doc. No. 15 at 15-24.) The Commissioner asserts that Claimant's arguments are without merit and that substantial evidence supports the ALJ's decision. (Doc. No. 19 at 10-17.)

**1. Listing Impairments.**

Claimant alleges that the ALJ erred in not finding that Claimant's mental and physical impairments met or medically equaled Listings 12.02, 12.04, 12.08, 1.04, and 12.05C. (Doc. No. 15 at 15-17.) Claimant first addresses Listings 12.02, 12.04 and 12.08, and contends that the ALJ improperly rejected the opinion of the medical expert that Claimant's impairments equaled the Listing. (Id. at 16.) Claimant asserts that the ALJ gave no reason for rejecting the medical expert's opinion and misinterpreted evidence from FMRS to suggest that Claimant was doing well on his medication, despite constant changes in medication to alleviate his symptoms. (Id.) Furthermore,

Claimant asserts that Ms. Caudell determined that Claimant's impairments met the "B" criteria of the Listing in finding that Claimant's social functioning was severely deficient. (Id.)

The Commissioner asserts that though the medical expert believed that Claimant's impairments were of Listing level severity, his opinion was not entitled to controlling weight as the ALJ "has the final responsibility for determining whether Plaintiff is disabled under Listings 12.02, 12.04, or 12.08, which is a conclusion of law." (Doc. No. 19 at 15.) The Commissioner further asserts that the medical expert's testimony is inconsistent with the record as a whole. (Id.)

"The Listing of Impairments . . . describes, for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. §§ 404.1525(a), 416.925(a) (2006); see Sullivan v. Zebley, 493 U.S. 521, 532, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990). "For a claimant to qualify for benefits by showing that h[er] unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, [s]he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." See id. at 531 (emphasis in original).

### A. *Listings 12.02, 12.04, and 12.08.*

Section 12.02 of the Listing of Impairments, covers Organic Mental Disorders, and provides as follows:

> *Organic Mental Disorders.* Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
> * * *
> B.  Resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning: or

3. Marked difficulties in maintaining concentration, persistence or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P., App. 1 § 12.02 (2006).

Section 12.04 of the Listing of Impairments provides that affective disorders, including depression, mood disorders, and bipolar disorders, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (2004).

Section 12.08 of the Listing of Impairments, covers Personality Disorders, and similarly provides as follows:

> *Personality Disorders.* A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness.
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
> * * *
> B.  Resulting in at least two of the following:

9

      1. Marked restriction of activities of daily living; or
      2. Marked difficulties in maintaining social functioning: or
      3. Marked difficulties in maintaining concentration, persistence or pace; or
      4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P., App. 1 § 12.08 (2006).

      The medical record reveals that Claimant sought psychological treatment at FMRS from July 22, 2004, through June 9, 2006. (Tr. at 273-79, 289-91, 396-404, 430-38.) On July 22, 2004, Claimant underwent a psychiatric evaluation by Barry C. Yates, M.D., Psychiatrist. (Tr. at 274-76.) Claimant reported that he was somewhat depressed, experienced crying spells, and had some loss of interests. (Tr. at 274.) He reported that he saw visions of his grandmother with a small child and wondered whether that referred to the child that he was expecting. (Id.) Claimant further reported problems sleeping, though he had periods of hyperactivity when he was more irritable, talkative, had racing thoughts, increased interest in sex, over spent, and engaged in risky behavior. (Id.) Finally, he reported that he felt closed in when in a crowd and washed his hands and checked the door lock several times a day. (Id.) On mental status exam, Claimant presented with a flat affect, average intelligence, fluent speech, and no evidence of delusions or a thinking disorder. (Tr. at 275.) Dr. Yates diagnosed Bipolar Disorder NOS, with psychotic features versus Schizoaffective Disorder; Social Anxiety; Rule out Psychotic Depression, though he did not seem that deeply depressed; Alcohol, Marijuana, and Opiate Abuse, in remission since 2003; Rule out Antisocial Personality and Obsessive Compulsive Disorder; and assessed a GAF of 65.[4] (Id.) Dr. Yates noted that Claimant was then taking Lexapro very haphazardly and that he was "not going to get much of a response with

---

      [4] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 61-70 indicates that the person has some mild symptoms or "some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

depression or OCD." (Tr. at 276.) He therefore, started him on Trileptal 300mg. (Id.)

On December 14, 2004, Claimant treated with Dr. Robert Rogan, D.O., Psychiatrist, at FMRS, who noted Claimant's reports of fleeting thoughts of suicide when he argued with his girlfriend. (Tr. at 291.) On January 25, 2005, Holly Thompson, PA-C, noted on exam that Claimant had significant psychomotor agitation and paranoia, but no hallucinations, delusions, obsessions, or compulsions. (Tr. at 290.) Claimant reported that he had auditory and visual hallucinations of his deceased grandmother, who told him to behave and do good things. (Id.) On April 1, 2005, Claimant denied suicidal or homicidal ideation and hallucinations or delusions, though he reported that he continued to be nervous at times. (Tr. at 289.) Dr. Rogan noted that "[o]verall the patient seems to be improving." (Id.) However, on April 19, 2005, Claimant reported that he had been taking only half his recommended dosage of Paxil and was having significant thoughts of harming himself or others. (Tr. at 398.) On exam, Claimant was angry and had a somewhat restricted affect. (Id.) He displayed significant mood lability and irritability. (Id.) Ms. Thompson noted that he "has had significant non-compliance issues in the past with multiple medications." (Id.) She increased his medications. (Id.)

On July 20, 2005, A. Byron Logan, PA-C, noted Claimant's reports of anxiousness, as well as his reports that he had discontinued some of his medication as it made him feel bad and feel pressure in his chest. (Tr. at 396.) On exam, Claimant maintained good eye contact and appropriate speech, though he exhibited a depressed affect and fair insight and judgment. (Id.) He was not suicidal, homicidal, or psychotic. (Id.) Mr. Logan diagnosed Bipolar Disorder, mostly depressive with psychotic features and underlying anxiety. (Id.) From July 20, 2005, through November 30, 2005, Claimant maintained a diagnosis of major depressive disorder with some psychotic features, denied visual or auditory hallucinations, and was not suicidal, homicidal, or psychotic. (Tr. at 434-38.) On November 30, 2005, Claimant reported that he felt better when taking medication and that he had not

felt well since he discontinued it. (Tr. at 434.) On June 9, 2006, Dr. Shivkumar L. Iyer, M.D.,

Psychiatrist, noted that Claimant was doing well on Seroquel, had a slightly dysphoric mood, good

insight and judgment, no auditory or visual hallucinations, and denied suicidal or homicidal ideation

or plan. (Tr. at 430.)

     Lisa C. Tate, M.A., a Licensed Psychologist, and Kimberly D. Caudell, M.A., a Supervised

Psychologist, conducted a Psychological Evaluation of Claimant on June 3, 2004. (Tr. at 225-32.)

Claimant reported a depressed mood, difficulty concentrating, sleep difficulty, weight gain, appetite

increase, past suicidal thoughts, and mood swings. (Tr. at 225.) Mental status exam revealed that

Claimant was alert and oriented, had a dysphoric mood and mildly restricted affect, logical and

coherent thought processes, no unusual perceptions, fair insight, and no indication of delusions,

obsessive thoughts, or compulsive behaviors. (Tr. at 227.) His judgment, memory, concentration, and

psychomotor behavior were within normal limits and he denied suicidal or homicidal ideation. (Tr.

at 228.) Based on his interaction with her during the evaluation, Ms. Tate opined that Claimant's

social functioning was moderately to severely deficient. (Tr. at 228.) In support of her opinion, Ms.

Tate noted that Claimant was fairly cooperative and responsive and maintained eye good contact, but

when responding to questions, he stared in a fixed fashion with little expression on his face, had an

observed dysphoric mood with irritability, and required some encouragement during the exam. (Id.)

     Intellectual testing revealed a verbal IQ score of 68, a performance IQ of 59, and a full scale

IQ of 62. (Tr. at 228.) In assessing these IQ scores as invalid, Ms. Tate noted that Claimant was

uninterested in testing, lacked adequate motivation, gave up easily, and required constant

encouragement. (Tr. at 229.) Ms. Tate diagnosed Mood Disorder NOS, and Polysubstance

Dependence, sustained full remission. (Id.) Given his lack of motivation and need of constant

encouragement, Ms. Tate further opined that his ability to maintain persistence was severely

deficient. (Tr. at 231.)

On July 2, 2004, Rosemary L. Smith, Psy.D., completed a form Psychiatric Review Technique, in which she opined that Claimant's Mood Disorder NOS was not a severe impairment, and resulted in no more than mild limitations in activities of daily living and in maintaining social functioning and concentration, persistence, or pace. (Tr. at 233-47.) She found that his condition had resulted in no episodes of decompensation. (Tr. at 243.) Similarly, Jeff L. Harlow, M.D., opined on September 23, 2004, that Claimant's depressive symptoms under 12.04, id not constitute a severe impairment. (Tr. at 258-71.) He, too, opined that his mental impairments resulted in no more than mild functional limitations or any episodes of decompensation. (Tr. at 268.)

Andrew Byron Logan, PA-C, completed a form Medical Assessment of Ability to Do Work-Related Activities (Mental), on August 17, 2005. (Tr. at 405-07.) He opined that Claimant maintained good ability to interact with supervisors and understand, remember, and carry out simple job instructions; fair ability to follow work rules, relate to co-workers, deal with the public, use judgment, deal with work stresses, maintain attention and concentration, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, demonstrate reliability, and understand, remember, and carry out detailed, but not complex job instructions; and poor ability to function independently and understand, remember, and carry out complex job instructions. (Tr. at 405-06.) In support of his limitations, Mr. Logan asserted that Claimant "has only limited social interaction skills and has intermittent depression. Memory and reasoning skills are moderate." (Tr. at 407.)

Finally, on May 10, 2005, Judith F. Lucas, M.A., a Licensed Psychologist, completed a psychological evaluation of Claimant. (Tr. at 408-11.) Intellectual testing revealed a verbal IQ of 78, performance IQ of 80, and a full scale IQ of 77. (Tr. at 409.) Ms. Lucas opined that these scores

indicated that Claimant was functioning in the borderline to low average range of intelligence. (Id.) Testing on WRAT-3 revealed that Claimant read at the fourth grade level and performed math at the fifth grade level. (Id.) Noting Claimant's reports of paranoia, possible hallucinations, anger control problems, and depression, Ms. Lucas diagnosed Claimant as suffering from Dysthymic Disorder, Borderline Personality Disorder, and Borderline Intellectual Functioning. (Tr. at 411.)

The ALJ summarized and evaluated the mental evidence of record and rejected Ms. Tate's opinion that Claimant's social functioning was severely deficient, as it was not consistent with the evidence of record. (Tr. at 19.) She further rejected the state agency assessments of Rosemary Smith and Jeff Harlow that Claimant had no severe mental impairment, as their opinions were inconsistent with all of the medical evidence of record. (Id.) At the administrative hearing, William Phelps testified as a psychological medical expert. (Tr. at 487-91.) Mr. Phelps noted that Claimant had a history of rather significant mental impairments and opined that he functionally equaled Listings 12.02, 12.04, and 12.08, though he acknowledged that Dr. Logan's RFC assessment of August 17, 2005, did not equate such a severe condition. (Tr. at 490-91.) The ALJ however, rejected Mr. Phelps' opinion that Claimant's impairments equaled the Listings as defined, as Claimant's treating mental health providers at FMRS did not indicate that his condition was so severe. (Tr. at 19.) She noted that the treatment records from FMRS indicated that Claimant "was doing well on his medication; his insight and judgment were good; and he was only mildly dysphoric." (Id.)

Based on the evidence as summarized above, the Court finds that the ALJ's decision that Claimant did not meet or equal a Listing impairment is supported by substantial evidence. The evidence does not indicate that Claimant met the "B" criteria of any of the Listing or the "C" criteria with regard to Listing 12.02 and 12.04. As the Commissioner notes, the determination as to whether a claimant meets a Listing level impairment is left to the ALJ. See 20 C.F.R. § 416.927(d)(2) (2006).

In this instance, the medical expert's testimony was inconsistent with the treatment notes, which indicated that contrary to Claimant's assertion, he improved when he took the prescribed medication as directed. Accordingly, the Claimant's argument in this regard is without merit.

### B. *Listing 1.04.*

Claimant next alleges that his central disc herniation and severe central canal stenosis meets Listing 1.04. (Doc. No. 15 at 16.) However, Claimant concedes that he does not have "motor loss reflected by atrophy with associated muscle weakness as required by part "A." (Id.) He further concedes that he "does not yet have the pain and muscle weakness which would cause an inability to ambulate effectively," so as to meet the "C" criteria. (Id. at 17.) The Commissioner asserts that Claimant concedes that he does not meet Listing 1.04. (Doc. No. 19 at 16.) Rather, he asserts that he partially meets the Listing, which is insufficient. (Id.)

Listing 1.04 provides as follows:

1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically accept-able imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App.1 § 1.04 (2007). Based on Claimant's concessions and the criteria

15

of Listing 1.04 as set forth above, the ALJ properly concluded that Claimant does not meet Listing 1.04. (Tr. at 16.) Accordingly, Claimant's allegation is without merit.

### C. *Listing 12.05C.*

Finally, Claimant alleges that he meets the criteria for disability as a result of mental retardation pursuant to Listing 12.05C. (Doc. No. 15 at 17-19.) Claimant asserts that he meets the first prong of 12.05C with the performance IQ of 70, as contained in the report of Dr. Steward, which he submitted as new evidence in support of his Motion to Remand. (Id. at 17.) Alternatively, Claimant asserts that pursuant the Social Security Administration Program Operation Manual System, he full scale IQ of 77, as determined by Ms. Lucas, should have been considered by the ALJ in evaluating 12.05C because his other impairments "impose additional and significant work-related limitations of function." (Id. at 18.) He asserts that his herniated disc condition causes extreme back pain and that his headaches and chest pain limit him to performing light work. (Id.) The Commissioner asserts that as Claimant acknowledges, his IQ of 77 is higher than the usual range to support an equivalence determination. (Doc. No. 19 at 16.)

Section 12.05 of the Listing of Impairments provides criteria for determining whether an individual is disabled by mental retardation or autism. "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2004). Additionally, in order to meet the criteria of § 12.05C, Claimant must show "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2004).

The Fourth Circuit has held that a claimant's additional "severe" impairment qualifies as a

significant work-related limitation for the purpose of listing § 12.05C. Luckey v. U.S. Dept. of Health & Human Serv., 890 F.2d 666 (4th Cir. 1989) (per curiam).  A "severe" impairment is one "which significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c) (2004). In Luckey, the Court ruled that:

> Luckey's inability to perform his prior relevant work alone established the significant work-related limitation of function requirement of § 12.05C.  Further, the Secretary has defined a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities.  The Secretary's finding that Luckey suffers from a severe combination of impairments also establishes the second prong of § 12.05C.

Id. at 669 (internal citations omitted).

As described in the introduction to the Listing, one of the essential features of mental retardation is significant deficits in adaptive functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00; See also, The Merck Manual of Diagnosis and Therapy 2259 (Mark H. Beers, M.D. & Robert Berkow, M.D., eds., 17th ed. 1999) (defining mental retardation as "significantly subaverage intellectual quotient with related limitations in two or more of the following: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.").[5] Also, according to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, ("DSM-IV")(1994), one of the essential features of mental retardation is significant deficits in adaptive functioning. Id. at 39-40. Adaptive functioning refers to how effectively an individual copes with common life demands and how well he meets the standards of personal independence expected of someone in his particular age group, sociocultural background,

---

[5] "In 1992 the American Medical Association on Mental Retardation changed the definition of mental retardation to reflect adaptation to the environment and interaction with others by a person with limited intellectual functioning.  Classification based on IQ alone (mild, 52 to 68; moderate, 36 to 51; severe, 20 to 35; profound, less than 20) has been replaced to that based on level of support needed." The Merck Manual of Diagnosis and Therapy 2259 (Mark H. Beers, M.D. & Robert Berkow, M.D., eds., 17th ed. 1999).

and community setting. Id. at 40. Thus, although Claimant appears to argue that Listing 12.05C is a two-part test, consisting only of the requisite IQ scores and an additional severe impairment, the Regulations make clear that it is a three-part test. The Introduction to section 12.00 of the Listings, section 12.00A, was revised in 2000 to state as follows:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A; 65 Fed. Reg. 50, 746, 50, 776; see also Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001) (detailing change).

Claimant does not allege that he had significant deficits in adaptive functioning and the Court finds no such deficits. Rather, Claimant contends that his IQ of 77, which is slightly higher than the required IQ of 60 to 70, is sufficient under POMS to meet Listing 12.05C. However, as Claimant notes in his brief, the POMS refers to a slightly higher IQ as being 70-75. Therefore, even under this standard, his IQ does not meet the criteria of Listing 12.05C. Accordingly, the Court finds that Claimant has neither demonstrated the requisite IQ or significant deficits in adaptive functioning. For these reasons, the Court finds that Claimant's argument is without merit.

**2. Severe Impairments.**

Claimant next alleges that the ALJ overlooked several of Claimant's impairments at step two of the sequential analysis. (Doc. No. 15 at 19-21.) These impairments include borderline personality disorder, possible obsessive compulsive disorder, hallucinations, far of being out in public/panic attacks, shizoaffective disorder/paranoia, and diffuse hydrocephalus with arachnoid cyst. (Id. at 20.) Furthermore, Claimant asserts that because the ALJ's hypothetical question to the ALJ failed to include limitations from these impairments, his reliance on the VE's testimony was misplaced. (Id.

18

at 20-21.)

To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe. 20 C.F.R. §§ 404.1520(c); 416.920(c) (2004)." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2004); see also 20 C.F.R. §§ 404.1521(a); 416.921(a) (2004); Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987) (recognizing change in severity standard). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1521(b); 416.921(b) (2004). Examples of basic work activities under those sections are:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations;  and
> (6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b); 416.921(b) (2004).

Regarding Claimant's alleged severe mental impairments, the Court finds that the mental evidence of record, as summarized above, indicates that these conditions were identified either as symptoms or diagnoses at some point throughout Claimant's treatment notes. However, there is no indication in the record that these conditions significantly limited his ability to perform basic work activities. Therefore, the ALJ's failure to find that these conditions constituted severe impairments is supported by substantial evidence of record.

Regarding Claimant's diffuse hydrocephalus with arachnoid cyst, the medical evidence demonstrates that he may have incurred this condition as the result of a motor vehicle accident. However, other than reports of some memory problems, which were not determined to be significant with regard to his mental conditions, the record does not indicate any significant limitations from the condition. Accordingly, the ALJ's decision that his hydrocephalus with arachnoid cyst was not a

19

severe impairment is supported by substantial evidence of record.

**3. <u>Medical Expert.</u>**

Claimant further alleges that the ALJ erred in not utilizing a non-psychological medical expert to provide testimony regarding the combination of Claimant's impairments. (Doc. No. 15 at 21-22.) He asserts that the ALJ "neither seriously considered nor discussed whether, in combination with his other impairments, [Claimant] equaled the requirements of the Listings." (<u>Id.</u> at 22.) The Commissioner asserts that the ALJ "discussed whether all of [Claimant's] physical and mental impairments, singly or in combination, meet or medically equal a listed impairment." (Doc. No. 19 at 16.)

As the Commissioner notes, the decision to call a medical expert at the administrative hearing is left to the discretion of the ALJ. <u>See</u> 20 C.F.R. §§ 416.927(f)(2)(iii); 404.1527(f)(2)(iii); 404.1529(b) (2006); <u>see also</u> <u>Siedlecki v. Apfel</u>, 46 F. Supp.2d 729, 732 (N.D. Ohio 1999). As the Court stated in <u>Siedlecki</u>, the Regulations give the ALJ discretion whether to call on a medical advisor, and the ALJ is responsible for reviewing the evidence and resolving conflicts in the medical evidence. 46 F.Supp.2d at 732.

The Social Security Regulations provide as follows:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. § 416.923 (2006). Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but

considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. Id. The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983.)

In the instant case, the medical record was sufficient for the ALJ to make his decision without the testimony of a medical expert. The Claimant fails to point to any specific portion of the record or any specific evidence demonstrating that the ALJ failed to consider the severity of Claimant's impairments in combination and "fractionalized" the impairments. As discussed above, the ALJ adequately considered the evidence of Claimant's mental impairments. Regarding his physical impairments, the ALJ acknowledged Claimant's allegations of chest pain, but noted that a chest x-ray, a second EKG, and a stress test, essentially were normal, or presented no significant limitations. (Tr. at 14.) Regarding back pain, the ALJ acknowledged Claimant's complaints of pain but noted that muscle strength and tone were normal, and that he had thigh pain on straight leg raising. (Tr. at 15.) At step three of the sequential analysis, the ALJ found that Claimant "does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments." (Tr. at 16-17.) Accordingly, the undersigned finds that the ALJ considered Claimant's impairments in combination and that substantial evidence supports the ALJ's finding that Claimant did not have a combination of impairments which met or medically equaled a Listing.

**4. Pain and Credibility.**

Fourth, Claimant alleges that the ALJ erred in rejecting Claimant's credible testimony of back pain and limitations. (Doc. No. 15 at 22-23.) Specifically, Claimant alleges that the ALJ dismissed his complaints of pain despite MRI evidence of a herniated disc and CT evidence of an arachnoid cyst. (Id. at 15.) Additionally, Claimant alleges that the ALJ ignored Claimant's repeated complaints

of pain to his doctor, as well as his pain medications. (Id.) The Commissioner asserts that the evidence supports the ALJ's finding that from March 16, 2004, through September 29, 2006, Claimant did not suffer from disabling back pain. (Doc. No. 19 at 12-14.)

A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (2006); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated. Id. at 595. When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's  subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2006). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:
>
>> (I) Your daily activities;
>>
>> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.

22

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2006).

SSR 96-7p repeats the two-step regulatory provisions:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the

"type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to

alleviate pain or other symptoms" in assessing the credibility of an individual's statements.

23

Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations.  A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms and credibility. (Tr. at 17-19.) Having resolved all doubts in Claimant's favor, the ALJ found, with regard to the threshold test, which is outlined above, that Claimant "has produced evidence of an impairment that could reasonably be expected to cause the alleged symptoms." (Tr. at 17.) The ALJ therefore proceeded to consider the intensity and persistence of

Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 17-19.) The ALJ noted the requisite factors, and then analyzed them in the opinion, concluding that "the objective findings and conservative care do not support the claimant's alleged disabling pain and limitations and disabling psychological symptoms." (Tr. at 18.) The ALJ therefore, found that Claimant's complaints of back pain were not credible. (Id.)

Contrary to Claimant's allegations, the ALJ acknowledged Dr. Crow's finding of positive straight leg raising on examination and the MRI scan evidence a large central disc herniation. (Tr. at 18, 283.) However, the ALJ noted that Claimant had not been examined by Dr. Crow since December 2, 2004. (Id.) The ALJ also noted that Dr. Crow indicated that he could perform surgery on Claimant's back, given that an adequate period of conservative physical therapy had not improved his condition. (Id.) Alternatively, Dr. Crow advised that Claimant could continue conservative efforts with physical therapy and a pain clinic evaluation. (Id.) The ALJ noted however, that Claimant chose neither option. (Tr. at 18.) Furthermore, despite Claimant's complaints of pain, Dr. Crow noted on exam that his range of motion of upper and lower extremities, motor strength, and gait were normal. (Tr. at 18, 282-83.) Additionally, Dr. Shamma found that Claimant's neurological exam was normal. (Tr. at 221.)

The Court finds that the ALJ properly considered the factors under 20 C.F.R. § 404.1529(c)(4), in evaluating Claimant's pain and credibility. The ALJ considered Claimant's subjective complaints of pain and limitations, his activities, and his conservative treatment. Though the ALJ did not reference specifically Claimant's pain medications, the record reveals that he consistently was prescribed Ultracet for his pain. There is no indication that he experienced significant side effects from this medication.

Based on the foregoing, the undersigned finds that Claimant's alleged symptoms and pain

25

and the limitations therefrom are not supported by the objective medical evidence of record. Furthermore, the record, as a whole, contains minimal complaints of pain and other symptoms, despite Claimant's self-assessed pain reports. The ALJ credited Claimant's subjective complaints to the extent that he is capable of performing light work, with occasional postural limitations and some mental limitations. (Tr. at 17.)

### 5. **Hypothetical Questions**.

Claimant alleges that the ALJ's hypothetical question to the VE was improper because the ALJ failed to include all of Claimant's impairments. (Doc. No. 15 at 23.) The Commissioner asserts that the ALJ's hypothetical question was accurate and encompassed all of Claimant's credible physical and mental limitations, and therefore, the ALJ reasonably relied on the VE's response. (Doc. No. 19 at 16-17.)

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities – presumably, he must study the evidence of record to reach the necessary level of familiarity." Id. at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. See Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

In his hypothetical questions to the VE, the ALJ included all of Claimant's impairments that were supported by the record. The ALJ first asked whether a person of Claimant's age, education,

past relevant work experience, and residual functional capacity, who read at the fourth grade level, performed math at the fifth grade level, was subject to occasional postural limitations, was restricted to simple job instructions, and had some ability to function independently, could perform any work. (Tr. at 492-93.) In response to the ALJ's hypothetical, the VE responded that such person could perform the jobs of hand packer, laundry worker, and kitchen worker. (Tr. at 493.) The ALJ then asked whether any of the jobs identified would be altered with the inclusion of a sit/stand option. (Id.) The VE responded that such a limitation would eliminate the job of a laundry worker.        Claimant has not identified any particular limitation, than those discussed above which are not supported by the record, resulting from Claimant's impairments which were not considered in the ALJ's hypothetical question. The Court finds that the hypothetical questions were proper, included those limitations supported by the record, and therefore, that the ALJ's decision is supported by substantial evidence.

## 6. **The ALJ's Duty to Develop the Record.**

Finally, Claimant alleges that the ALJ failed to develop the record regarding Claimant's impairments. (Doc. No. 15 at 23-24.) Specifically, he contends that the ALJ failed to secure further investigation of Claimant's possible obsessive compulsive disorder, hydrocephalus, headaches, panic attacks, and arachnoid cyst. (Id.) Furthermore, the ALJ did not do further follow-up regarding the functional limitations on Claimant's ability to work. (Id. at 24.) The Commissioner asserts that the ALJ "has no duty to go to inordinate lengths to develop a claimant's case." (Doc. No. 19 at 17.) (internal quotations and citations omitted). Claimant notes that the record in this case includes a consultative psychological evaluation, medical expert testimony, and reports from Claimant's various medical sources, and therefore, the record is developed fully. (Id.)

In Cook v. Heckler, the Fourth Circuit noted that an ALJ has a "responsibility to help develop

the evidence." <u>Cook v. Heckler</u>, 783 F.2d 1168, 1173 (4th Cir. 1986). The court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." <u>Id.</u> The court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's arthritis claim, in order to determine if it met the requirements in the listings of impairments, amounted to a neglect of his duty to develop the evidence. <u>Id.</u>

Nevertheless, it is Claimant's responsibility to prove to the Commissioner that he is disabled. 20 C.F.R. § 416.912(a) (2004). Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he has an impairment. <u>Id.</u> § 404.1512(c). In <u>Bowen v. Yuckert</u>, the United States Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of proof never shifts to the Secretary. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

<u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5 (1987).

The ALJ has a duty to help develop the case as indicated above. This duty is especially important when the plaintiff presents *pro se.* The court in <u>Walker v. Harris</u>, 642 F.2d 712, 714 (4th Cir. 1981) stated that "[r]ecent cases in this circuit firmly establish that, even though the record as it is presented to the court may contain substantial evidence to support the Secretary's decision, the court may still exercise its power to remand for the taking of additional evidence. In a great number of cases, courts of appeals have found good cause to remand where the administrative law judge fails diligently to explore all relevant facts especially in cases of uneducated, pro se claimants and where

the absence of counsel appears to prejudice a claimant." Walker v. Harris, 642 F.2d 712, 714 (4th Cir. 1981) (internal citations omitted); see also Crider v. Harris, 624 F.2d 15, 16 (4th Cir. 1980) (Claimant appeared *pro se* and so was entitled to the sympathetic assistance of the ALJ to develop the record, to " 'assume a more active role' and to adhere to a 'heightened' duty of care and responsibility"); Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986); Sims v. Harris, 631 F.2d 26, 28 (4th Cir. 1980) ("It is equally settled that in pro se cases, Administrative Law Judges have a duty to assume a more active role in helping claimants develop the record.").

At the administrative level, a claimant is permitted to be represented by either an attorney or a qualified non-attorney representative. See 42 U.S.C. § 406; 20 C.F.R. §§ 404.1705 & 416.1505 (2004). In the instant matter, it appears that Claimant was represented by a paralegal, or a non-attorney representative. While Claimant does not challenge his representative's qualifications, he essentially argues that she was an ineffective advocate for not developing the record with regard to Claimant's alleged impairments. The Court finds that the ALJ did not err in her duty to develop the record. The medical evidence of record does not demonstrate that Claimant's possible obsessive compulsive disorder, hydrocephalus, headaches, panic attacks, and arachnoid cyst, were severe impairments and Claimant fails to identify any specific manner in which the ALJ should have developed the record.

## 7. **Motion to Remand.**

Claimant has also submitted new evidence to the Court in the form of a Psychological Evaluation from L. Andrew Steward, Ph.D., Licensed Psychologist, which was prepared for the Summers County Department of Health and Human Resources to aid in the determination of whether Claimant was able to care for his child. (Doc. No. 13, Exhibit A.) This evaluation is dated February 28, 2007, well after the date of the ALJ's decision and the Appeals Council's denial of review in the

instant case. The report of Dr. Steward's evaluation demonstrates that Claimant has a verbal IQ of 76, performance IQ of 70, and a full scale IQ of 71. (Doc. No. 13, Exhibit A at 5.) The report further reflects diagnoses of depressive disorder NOS, anxiety disorder NOS, panic disorder without agoraphobia, borderline intellectual functioning, and a GAF of 52. (Id. at 9.)

To justify a remand to consider newly submitted medical evidence, the evidence must meet the requirements of 42 U.S.C. § 405(g) and Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985).[6] In Borders, the Fourth Circuit held that newly discovered evidence may warrant a remand to the Commissioner if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed and not simply cumulative; (2) the evidence is material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant has presented to the remanding court "at least a general showing of the nature" of the newly discovered evidence.  Id.

First, as previously noted, the evidence is dated well after the date of the ALJ's decision and

_____

[6] Within relevant case law, there is some disagreement as to whether 42 U.S.C. § 405(g) or the opinion in *Borders* provides the proper test in this circuit for remand of cases involving new evidence.  This court will apply the standard set forth in Borders in accordance with the reasoning previously expressed in this district:

> The court in *Wilkins v. Secretary of Dep't of Health & Human Servs.*, 925 F.2d 769 (4th Cir. 1991), suggested that the more stringent  *Borders* four-part inquiry is superseded by the standard in 42 U.S.C. 405(g).  The standard in § 405(g) allows for remand where "there is new evidence which is material and . . . there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." However, Borders has not been expressly overruled.  Further, the Supreme Court of the United States has not suggested that *Borders*' construction of §  405(g) is incorrect.  Given the uncertainty as to the contours of the applicable test, the Court will apply the more stringent *Borders* inquiry.

*Brock v. Secretary, Health and Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992) (citations omitted).

the Appeals Council's denial of review in the instant case.  The Court is unable to say that it is entirely relevant because there is no indication that it relates back to the time period under consideration before the ALJ. Second, the evidence does not appear to be material because it is cumulative of the psychological evidence already of record. The record already contains several IQ scores. Claimant's IQ was evaluated on June 3, 2004, by Ms. Tate; on May 10, 2005, by Ms. Lucas; and on April 24, 1995, by William Brezinski, M.A., Licensed School Psychologist, the latter of which was evaluated when Claimant was a minor child in school. (Tr. at 188-92, 225-32, 408-11.) Furthermore, as the Commissioner notes, Dr. Steward's report of his psychological evaluation does not establish a Listing impairment of mental retardation. Rather, the report demonstrates that Claimant suffers from borderline intellectual functioning, which the evidence of record confirms. (Tr. at 15, 411, 488.)

Third, as stated above, the report is dated after the date of the ALJ's decision and the Appeals Council's denial of review in this case. Therefore, to the extent that the report was not prepared prior thereto, Claimant has shown good cause for the failure to submit this evidence when the claim was before the Commissioner. However, to the extent that the IQ scores are reflective of Claimant's intellectual functioning during the relevant period of time at issue in this case, Claimant has not shown good cause why he did not seek further testing when the claims was before the Commissioner. Finally, Borders requires that the Claimant present at least a general showing of the new evidence to the Court.  Claimant has attached the new medical evidence as an Exhibit to his Brief in Support of the Motion to Remand. However, the Claimant has failed to satisfy all four factors of Borders, particularly the first two factors, and, therefore, remand would be inappropriate. The Court finds that the Commissioner's decision is  supported by substantial evidence.

After a careful consideration of the evidence of record, the Court finds that the

Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion to Remand (Doc. No. 12.) is **DENIED**, Plaintiff's Motion for Judgment on the Pleadings (Doc. No. 14.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Doc. No. 19.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: March 31, 2008.

R. Clarke VanDervort
United States Magistrate Judge